**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| CLAIRE RAND, Individually And On Behalf Of All Others Similarly Situated, | Civil Action No. __-_____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| ALIBABA GROUP HOLDING LIMITED, JACK YUN MA; JOSEPH C. TSAI, JONATHAN ZHAOXI LU, MAGGIE WEI WU, | |
| Defendants. | |

Plaintiff, Claire Rand, individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters. Plaintiff's allegations are based on the investigation conducted by Plaintiff's attorneys, which included, among other things: (a) a review and analysis of Alibaba Group Holding Limited ("Alibaba" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of certain press releases, public statements, and other publications disseminated by or concerning Alibaba and the defendants named herein and related parties; (c) a review and analysis of Alibaba's press conferences, analyst conference calls, conferences, presentations, and corporate website; and (d) a review and analysis of other publicly available information concerning Alibaba and the defendants named herein.

## I.    SUMMARY OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons or entities who purchased or otherwise acquired Alibaba's publicly traded American Depositary Shares ("ADSs") on a U.S. securities exchange between October 21, 2014 and January 28, 2015,

inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      Alibaba is a Chinese e-commerce company that provides consumer-to-consumer, business-to-consumer, and business-to-business sales services via web portals, as well as electronic payment services, a shopping search engine, and data-centric cloud computing services. Alibaba claims in filings with the U.S. SEC and in press releases directed to investors  to be the "largest online and mobile commerce company in the world in terms of gross merchandise volume," based on numbers from 2013.  Among its numerous platforms are Alibaba.com, the world's largest online business-to-business trading platform for small businesses; Taobao Marketplace ("Taobao"), China's largest consumer-to-consumer online shopping platform; and Tmall.com ("Tmall"), an online retail platform.

3.      Alibaba conducted its United States initial public offering ("IPO") on September 19, 2014, and Alibaba's ADSs began trading on the NYSE on September 19, 2014, under the ticker symbol "BABA."

4.      During the Class Period, Defendants made materially false and misleading statements, in SEC filings and in press releases and on conference calls directed to investors, about the Company's efforts to combat the sale of counterfeit and other illegal goods through Alibaba platforms such as Taobao and Tmall, downplaying the volume and widespread availability of such goods through its platforms, and misrepresenting the efficacy of its efforts to combat the sale of such goods.  Among numerous other statements to similar effect, the Company stated it had a "zero-tolerance policy" for counterfeit goods.  Further, Defendants issued repeated public

statements that Alibaba does not benefit from sales of counterfeit goods, let alone rely on them for its business model.  For example, in a December 23, 2014 press conference, the Company's CEO, Defendant Jonathan Zhaoxi Lu ("Lu") said that "in the end, counterfeiting hurts Alibaba Group as consumers who receive fake goods may no longer want to shop on our platforms."

5.      Alibaba never publicly disclosed, however, that in July 2014 – just two months before the IPO – principal officers and management teams from the core departments of Alibaba had met with representatives of China's State Administration for Industry and Commerce ("SAIC"), China's main corporate regulator, and had received "administrative guidance" about counterfeit and contraband goods sold over its platforms as well as other illegal activity, including widespread fraudulent transactions, the taking of illegal commercial bribes by Alibaba employees, and inadequate controls to prevent illegal sales and other improper activities.

6.      In Alibaba's September 2014 Initial Public Offering ("IPO"), Alibaba and certain insider "selling shareholders" sold a total of more than 368 million ADSs at $68 each, raising over $25 billion.  Defendant Jack Yun Ma ("Ma") – a co-founder of Alibaba, and current Executive Chairman of the Board – sold 12.75 million shares for a total of $867 million.  Defendant Joseph C. Tsai – also a co-founder, and current Vice Chairman – sold 4.25 million shares, for a total of $289 million.

7.      On January 28, 2015, the SAIC posted a "white paper" on its website that summed up the administrative guidance that had been given to Alibaba management in July 2014 (the "SAIC White Paper").  The SAIC White Paper accused Alibaba of having grossly inadequate and weak internal controls regarding the sale of counterfeit and illegal goods on Alibaba.com, Taobao, and Tmall, and of engaging in illegal activity including, *inter alia*, taking commercial bribes and permitting fraudulent transactions.   The SAIC White Paper was posted in Chinese, but several

English-language financial news outlets, including the *Wall Street Journal*, reviewed its contents and disclosed the report in English on January 28, 2015, prior to the market's open. One asset manager told the *Journal*: "I think this dispute could pose a serious risk for Alibaba….It could damage not only Alibaba's relationship with the government and regulators, but also the perception among consumers. If consumers lose confidence in Alibaba, its business will be affected….As an investor, we prefer more disclosure and transparency, especially when it comes to important issues like regulation and relationships with the government. And in this case, the issue seems very relevant to Alibaba's core business."

8.      On this news, Alibaba ADSs declined $4.49 per ADS or approximately 4%, to close at $98.45 per ADS on January 28, 2015, with unusually high volume of approximately 42 million ADSs traded.

9.      On January 29, 2015, before the market opened, the news website Quartz (www.qz.com) posted a translation of the section of the SAIC White Paper that specified in detail all of the ways in which Alibaba had failed to prevent, and even encouraged, the sale of counterfeit and illegal goods, as well as other illegal activity on its affiliated websites.

10.     The publication of the SAIC White Paper revealed that Alibaba had not only failed to disclose the fact that the Company's principal officers and top management had the meeting with the SAIC, and the allegations that the SAIC had made against the Company, but that Alibaba had not been forthright about the true extent of its problems with counterfeit goods. Alibaba misled investors as to how widespread the problems were, how effective its supposed efforts to combat the counterfeit problem were, and the extent to which Alibaba's business model was dependent on counterfeit sales. As one commentator told *Bloomberg*, "There is a bit of irony here since Alibaba

loves to tell the world about how strict it is on piracy and how it moves quickly to shut down sites that sell fake goods."  Further, the SAIC White Paper described, in detail, problems such as:

- Failure to prevent unlicensed business operators from selling via Alibaba platforms;

- Failure to ensure sellers on Alibaba platforms reveal their actual identities;

- Lax controls regarding sellers operating under trademarks and corporate names they did not own the rights to;

- Widespread sale of unlicensed products, substandard quality products, and products sold pursuant to pyramid schemes

- Sales of fake cigarettes, fake alcohol, imitation mobile games, fake designer bags, fake licenses, as well as illegal items such as weapons and spying equipment

- An unreasonably high threshold for responding to consumer complaints, combined with an inefficient response system;

- False and illegal advertising;

- Unreasonable terms-of-service contract provisions requiring consumers to waive basic legal rights;

- Widespread soliciting of commercial bribes by Alibaba staff in exchange for giving certain sellers undue advantages in selling over Alibaba platforms;

- Tolerance of "fictitious transactions" used solely to increase sellers' ratings or rankings; and

- Penalties that were too light to disincentivize illegal and improper seller activity.

11.     The SAIC White Paper, combined with disappointing financial results for the third quarter ended December 31, 2014, also reported before the market open on January 29, 2015, caused Alibaba's ADSs to fall an additional $8.64 per ADS, or nearly 9%, to close at $89.81 per ADS, on volume of over 76 million ADSs traded.  The two declines collectively reduced the price of Alibaba ADSs more than 25% from their Class Period high of $120 per ADS (reached in intraday trading on November 13, 2014), wiping out more than $11 billion in market capitalization.

## II.   JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b). Alibaba's shares trade on the New York Stock Exchange, which is located within this District, and the Company's SEC filings state that Alibaba has "appointed Corporation Service Company, located at 1180 Avenue of the Americas, Suite 210, New York, New York 10036 as our agent to receive service of process with respect to any action brought against us in the United States District Court for the Southern District of New York under the federal securities laws of the United States...."

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.   THE PARTIES

16.     Plaintiff, Claire Rand, purchased Alibaba ADSs in reliance on defendants' materially false and misleading statements and omissions of material facts and the integrity of the market for Alibaba ADSs at artificially inflated prices during the Class Period, and was damaged when the truth about Alibaba that was misrepresented and omitted during the Class Period was revealed to the market.

17.     Defendant Alibaba is, by gross merchandise volume, the largest e-commerce and

mobile commerce company in the world. Alibaba is a Cayman Islands holding company and conducts its business in China through its subsidiaries and variable interest entities. Alibaba's principal business is headquartered in Huangzhou, China, and it maintains 90 offices in China, 19 outside of China, and data centers and logistics facilities in China, Hong Kong, and the United States. Alibaba ADSs trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BABA."

18.     Defendant Ma was the leader of the team that founded Alibaba in 1999, and has served as the Company's Executive Chairman since May 2013. He served as the Company's Chief Executive Officer ("CEO") and Chairman from the Company's founding until May 2013.

19.     Defendant Tsai ("Tsai") was a member of the team that founded the Company in 1999, and has served as the Company's Executive Vice Chairman since May 2013. He previously served as the Company's CFO.

20.     Defendant Lu has been the Company's CEO since May 2013. He joined Alibaba in 2000 and served in various other executive and management roles prior to becoming CEO.

21.     Defendant Maggie Wei Wu ("Wu") has served as the Company's Chief Financial Officer ("CFO") since May 2013. She joined the Company in July 2007 as CFO of Alibaba.com, and served as Alibaba's deputy CFO from October 2011 to May 2013.

22.     Alibaba, Ma, Tsai, Lu, and Wu are referred to herein as the "Defendants." Defendants Ma, Tsai, Wu, and Lu are referred to herein as the "Individual Defendants."

## IV.    CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action on behalf of a Class, consisting of all persons or entities who purchased or otherwise acquired the publicly traded ADSs of Alibaba on a U.S. stock exchange during the Class Period (October 21, 2014 through January 28, 2015, inclusive), and who were damaged thereby. Excluded from the Class are Defendants, the officers

and directors of Alibaba, at all relevant times, members of their immediate families (as defined in 17 CFR § 240.16(a)-1) and their attorneys, legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

24.     This action is brought pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

25.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are potentially thousands of members in the proposed Class.  During the Class Period, approximately 320 million ADSs of Alibaba, representing an identical number of Alibaba ordinary shares, were outstanding. The proposed Class may be identified from records maintained by Alibaba or its transfer agent and may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in securities class actions.

26.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff purchased Alibaba ADSs during the Class Period and was damaged by Defendants' violations of the Exchange Act.  All members of the Class are similarly affected by Defendants' wrongful conduct.

27.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with the Class it seeks to represent.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a. whether Sections 10(b) or 20(a) the Exchange Act, or Rule 10b-5 promulgated thereunder, were violated by Defendants' acts as alleged herein;

b. whether Alibaba's filings with the SEC, including its quarter-end and year-end reports, the documents referenced therein, and/or public statements by Defendants on behalf of Alibaba were materially false or misleading;

c. whether Defendants acted with scienter in misrepresenting and/or omitting to state material facts;

d. whether the market price of Alibaba ADSs was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein; and

e. to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

29. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.   FACTUAL ALLEGATIONS

### A.   Background of the Company

30. Founded in 1999 by a group led by Jack Ma, Alibaba is the dominant player in Chinese e-commerce and mobile commerce. The Company began as an online business-to-business wholesale company, operating Alibaba.com, its global wholesale site, and the predecessor

of 1688.com, its China wholesale site. Over the following decade, Alibaba launched a variety of businesses including Taobao, an online payment system called Alipay, an online marketing technology platform called Alimama, Tmall, and Alibaba Cloud Computing.

31.     The Company derives the vast majority of its revenue -- 81.6% for FY2014 – from its China retail marketplaces, Taobao, Tmall, and Juhuasuan (a group buying platform), and the bulk of this, revenue, in turn, is derived from Taobao and Tmall.

32.     Alibaba's retail and wholesale businesses do not warehouse, ship or sell products for their own account; rather they are sales portals and platforms whereby third-party merchants can sell their goods to third-party buyers. The sale of counterfeit and contraband goods over its platforms has long been an issue with a significant potential impact on Alibaba's business.

33.     Even prior to its IPO, Alibaba publicly touted its supposedly robust efforts to curb counterfeit goods and illegal activity on its platforms. For example, on April 14, 2014, Alibaba's proprietary news website, Alizila, published an article entitled "Fight Against Online Sale of Fakes Goes on for Alibaba Group":

> In an ongoing battle against the online sale of counterfeit merchandise, Alibaba Group, China's largest operator of Web shopping platforms, removed an estimated 114 million listings for suspected fake goods from the company's giant Taobao Marketplace during the first ten months of 2013.
>
> The listing takedowns, which increased by 31 percent compared with the number of takedowns in the full year of 2012, **are part of a comprehensive effort by Alibaba Group to curb intellectual property rights (IPR) infringement on its Taobao Marketplace, Alibaba.com, AliExpress, and Tmall.com ecommerce websites, according to company officials.**
>
> \*\*\*
>
> **Alibaba recently issued a statement on its position on piracy: "Alibaba Group is highly committed to the protection of intellectual property rights and the fight against counterfeiting. The company works with brands, associations, government agencies and other stakeholders to create visible and significant results in the intellectual property enforcement space."**

**B.    Defendants' False and Misleading**
      **Statements Prior and During the Class Period**

34.    On May 6, 2014, Alibaba filed with the SEC a Registration Statement on Form F-1, which would later be utilized for the IPO following a total of seven amendments, the last of which was filed on September 15, 2014.  Each of the Individual Defendants signed the Registration Statement.  On September 18, 2014, the SEC declared the Registration Statement effective.

35.    On or about September 19, 2014, Alibaba priced the IPO at $68 per ADS.  On September 22, 2014, Alibaba filed with the SEC its final Prospectus for the IPO, which forms part of the Registration Statement (collectively, the "Registration Statement").   Although the Registration Statement acknowledged that counterfeit goods and other illegal activity were problems for the Company, it touted the strength of Alibaba's programs to combat counterfeiting and "fictitious transactions" (sham transactions designed solely to boost a seller's rating or ranking):

> ***Measures against counterfeit products.*** To protect consumers, brand owners and legitimate sellers and to maintain the integrity of our marketplaces, we have put in place a broad range of measures to prevent counterfeit and pirated goods from being offered and sold on our marketplaces. These measures include:
>
> - identifying, issuing warnings and taking down counterfeit products from our marketplaces;
>
> - providing an online complaint platform for brand owners to report infringements;
>
> - conducting random checks by using third parties to purchase suspected counterfeit products on our marketplaces; and
>
> - enhancing our communication with various relevant government authorities to eradicate sources of counterfeit goods.
>
> We have also established cooperative relationships with over 1,000 major brand owners and several industry associations in connection with intellectual property rights protection to enhance the effectiveness of our take-down procedures and other anti-counterfeiting measures.

*Measures against fictitious transactions.* We have implemented measures to prevent, detect and reduce the occurrence of fictitious transactions on Taobao Marketplace and Tmall including:

- requiring the use of sellers' real identities to set up accounts with us;

- analyzing transaction patterns to identify anomalies;

*Penalties.* **We maintain a "no tolerance" policy with regard to counterfeit and fictitious activities on our marketplaces.** However, because many sellers doing business on our marketplaces depend on us for their livelihood, we have generally eschewed a "shoot-first, ask questions later" approach to handling complaints. When we receive complaints or allegations regarding infringement or counterfeit goods, we follow well-developed procedures to verify the nature of the complaint and the relevant facts before de-listing the items. Generally, we give sellers who have been accused of posting or selling counterfeit products up to three days to refute the allegations and provide evidence of the authenticity of the product.

If allegations of posting or selling counterfeit products have not been refuted or fictitious activities have been confirmed, we penalize the parties involved through a number of means including:

- immediately delisting the products;

- arranging for the seller to reimburse the buyer;

- assessing penalty points against the seller or limiting its ability to add listings for a certain period;

- adopting a "name and shame" policy;

- imposing restrictions from participation in promotional activities on our marketplaces; and

- closing down storefronts and, for Tmall sellers, confiscating the consumer protection security deposits paid. The seller is banned permanently from establishing another storefront on our marketplaces.

In appropriate circumstances we also notify the relevant law enforcement and other authorities to take legal action against the offending party, including in extreme cases criminal proceedings.

36.     These statements were false and/or misleading because they grossly overstated the actual efficacy of Alibaba's efforts to combat the sale of counterfeit goods and other illegal activity, and omitted material facts necessary to provide public investors a full picture of the extent

of Alibaba's problems with counterfeit goods and illegal activity, as later revealed by the SAIC White Paper. They also misrepresented that it was in Alibaba's best financial interest to minimize the sale of counterfeit goods on its platform, when in fact, as would later be revealed, it depends on those counterfeit sales for its outsized revenues and growth.

37.     On November 4, 2014, Alibaba issued a press release announcing financial results for the quarter ended September 30, 2014 (the "2Q2015 Results"). The Company reported revenues of $2.7 billion, and net income of $494 million ($0.20 per share), for the quarter. Defendant Lu touted the following:

> We delivered a strong quarter with significant growth across our key operating metrics….**Our business continues to perform well, and our results reflect both the strength of our ecosystem and the strong foundation we have for sustainable growth**. On our China retail marketplaces, gross merchandise volume for the quarter increased 49% and annual active buyers increased 52% year on year. We extended our unrivaled leadership in mobile with 217 million monthly active users on our mobile commerce apps in September and US$95 billion in mobile GMV for the twelve months ended September 2014. We are also encouraged by continued improvement of mobile monetization which demonstrates the strong commercial intent of our users.

Defendant Wu touted:

> Our financial performance this quarter was robust, with revenue growing 54% year on year….We continue to execute our focused growth strategy, and the fundamental strength of our business gives us the confidence to invest in new initiatives to add new users, improving engagement and customer experience, expand our products and services and drive long-term shareholder value.

38.     The same day, Defendants Tsai, Lu, and Wu also made additional positive comments about the Company's financial success and growth in an investor conference call, in which, again, there was no mention of discussions with the SAIC or of the Company's problems with counterfeit goods, fraudulent transactions, and commercial bribes.

39.     On December 23, 2014, Alibaba issued a press release that included the text of a speech given by Defendant Lu in the Company's 2014 Counterfeit Report Press Conference, in

which Defendant Lu insisted that Alibaba took counterfeit sales very seriously:

Ever since the founding of Alibaba Group in 1999, it has been our mission to make it easy to do business anywhere. **This ease of doing business must be facilitated by trust. We believe that trust is the basis for wealth and that trust is an important currency that makes our e-commerce platforms tick.** All the work that we have done over the past 15 years underscores this belief.

**Since the establishment of Taobao in 2003, Alibaba Group has constantly fought to protect the interests of consumers in the Internet space and together with our valued government partners, we have made great strides in addressing this issue.**

However counterfeiting is a global problem and one that we need to face together as a society. **From Alibaba Group's perspective, we bear a serious responsibility in this fight against counterfeits. Jack Ma said yesterday – if e-commerce does well in China, that may have little to do with Alibaba Group, but if counterfeits in society are not tackled effectively, it has a lot to do with Alibaba Group.**

In our years of combating this problem, **we have built cooperative relationships with various government bodies to combat counterfeiting at its source in order to safeguard the interests of consumers. We have built systems and services like Alipay that are based on trust and are there to protect the consumer because in the end, counterfeiting hurts Alibaba Group as consumers who receive fake goods may no longer want to shop on our platforms.**

**Thankfully, Internet technology has made it easier for transactions to be traced. This means that by analyzing transaction data we can trace counterfeiters who sell online. Through the analysis of big data, online sources of counterfeit products can be tracked offline, making it easier to enforcement authorities to do their work.**

**Secondly, we believe that protecting customer rights and combating counterfeits should be a long-term and persistent goal.** To achieve that, support needs to come from all levels of society. Through the years, **Alibaba Group has become more effective at protecting consumer rights and combating counterfeits. According to the latest data available, only 3.5 transactions in every 10,000 transactions received customer complaints, 22% decline from last year.**

\*\*\*

14

We would like to thank the various government ministries and the "Office of the National Leading Group on the Fight Against IPR Infringement and Counterfeiting" for their guidance as we know the battle against counterfeits is not easy. **It is our hope that with these efforts, consumers will no longer feel worried about buying counterfeits online and brands are no longer plagued by fake goods and that the market will become one where honest people get to take a larger share of the market.**

(emphasis added)

40.     The December 23, 2014 press release then represented the Company's efforts to combat counterfeit goods, in a section titled "2014 IPR Highlights," including, *inter alia*:

**Key Achievements:**
- From the beginning of 2013 till end of November this year, Alibaba Group has invested over RMB 1 billion ($160.7 million) focusing on tackling counterfeit and enhancing consumer protection.

- A task force of over 2,000 is spearheading the counterfeit effort with the plan to add another 200 people next year. The Group has also enlisted around 5,400 volunteers to assist with daily online surveillance and selective inspection.

**Collaboration with law enforcement authorities to eliminate the source of counterfeit goods:**
- Alibaba Group cooperated with Chinese law enforcement agencies in over 1,000 counterfeiting cases this year. As a result of this collaboration, 400 suspects from 18 counterfeiting rings were arrested while 200 brick and mortar stores, factories or warehouse involved in production and selling of counterfeits were closed.

- Since 2010, Taobao Marketplace has worked with Zhejiang Intellectual Property Office in 3,000 IPR-infringing cases.

**Working closely with brand owners:**
- As of September this year, Alibaba Group cooperated with 1,137 brand owners and to identify and remove IP-infringing goods from our marketplaces.

**Widened our coalition of international associations dedicated to IPR protection:**
- Alibaba Group has signed MOUs with major international associations to protect IP rights. These include the Korean Intellectual Property Protection Association, China-Britain Business Council and Business Software Alliance. This year, Alibaba Group in conjunction with China's Public Security Bureau,

the General Administration of Quality Supervision, China's State Intellectual Property Office and State Administration of Press, Publication, Radio, Film and Television formed an "Intellectual Property Protection Working Group". Alibaba Group's Chief Executive Officer Jonathan Lu will be the Working Group's Chairman.

- Alibaba Group passed information and leads gathered online to the Shanghai police and the Shanghai Public Security Bureau of Economic Crime Investigation Corps that led to the investigation of 41 counterfeiting cases and the arrest of 103 suspects involved in counterfeiting brands such as Nike, Jordan, 3M, UGG, Prada, Chanel, etc. A highlight of the cooperation with Shanghai authorities was that it led to the smashing of four regional 3M face masks counterfeiting rings in Shanghai, Guangzhou, Shijiazhuang and Suzhou. The crackdown on fake 3M goods saw the arrest of 12 suspects and the destruction of over 3,000 boxes of fake 3M face masks with a street value exceeding RMB 31.1 million ($5 million).

- Alibaba Group worked with the Fujian Provincial Public Security Bureau to gather clues and crack down on over 200 online stores selling counterfeit shoes and luxury goods. Brands involved include Nike, Adidas, Louis Vuitton, Gucci, etc. A total of 89 suspects were arrested and RMB 45 million ($7.2 million) worth of counterfeit goods were seized.

- An Alibaba Group IPR report found that 90 percent of all counterfeit goods were distributed from 10 regions in China. The top three regions were cities in China's Pearl River Delta region, Yangtze River Delta region, Southeast China.

- By using transaction data and mapping technology Alibaba Group found that more than 60 percent of counterfeit watches and jewelry originate from Southern China, while 60 percent of counterfeit outdoor sporting goods are from Southeast China region and 50 percent of counterfeit apparel originates from Eastern China.

41.    The December 23, 2014 press release further touted the Company's "methodology"

for preventing and removing counterfeit goods, and its "penalties" for infringement:

**Methodology**
**Alibaba Groups adopts a zero-tolerance policy toward counterfeit goods sold on our platforms.** To protect consumers, brand owners and legitimate sellers and to maintain the integrity of our marketplaces, we have a broad range of measures to prevent counterfeit and pirated goods from being offered and sold on our marketplaces.

- We use data mining technology to analyze and track transactions of IPR-infringing products and identify hotspots for counterfeit distribution and sales.

- Alibaba Group will continue to work with Chinese public security, copyright, quality inspection, the intellectual property agencies to take the online fight against counterfeits offline.

- We provide an online complaint platform for brand owners to report infringements.

- We conduct random checks by using third parties to purchase suspected counterfeit products on our marketplaces.

- We have established cooperative relationships with over 1,000 major brand owners and several industry associations in connection with intellectual property rights protection to enhance the effectiveness of our take-down procedures and other anti-counterfeiting measures.

**Penalties**

When we receive complaints or allegations regarding infringement or counterfeit goods, we follow well-developed procedures to verify the nature of the complaint and the relevant facts before de-listing the items. Generally, we give sellers who have been accused of posting or selling counterfeit products up to three days to refute the allegations and provide evidence of the authenticity of the product.

If allegations of posting or selling counterfeit products have not been refuted or fictitious activities have been confirmed, we penalize the parties involved through a number of means including:

- immediately delisted products

- arranging for the seller to reimburse the buyer

- assessing penalty points against the seller or limiting its ability to add listings for a certain period

- adopting a "name and shame" policy

- closing down storefronts and for Tmall.com sellers, confiscating the consumer protection security deposits paid. The seller is also banned permanently from establishing another storefront on our marketplaces.

42.     The December 23, 2014 Press Release failed to disclose the July 2014 SAIC meeting, nor did it disclose or address many of the allegations and concerns that SAIC officials

raised to Alibaba management at that meeting. Thus, these statements were false and/or misleading because they grossly overstated the actual efficacy of Alibaba's efforts to combat the sale of counterfeit goods and other illegal activity, and omitted material facts necessary to give a full picture of the extent of Alibaba's problems with counterfeit goods and illegal activity, as later revealed by the SAIC White Paper.

## VI.  THE TRUTH EMERGES

43.  On January 28, 2015, before the market opened, numerous news outlets reported that the SAIC had posted the White Paper (in Chinese only) on its website, publicly disclosing for the first time the July 2014 meeting with Alibaba management, and describing the "administrative guidance" the SAIC had given Alibaba on its failure to control sales of counterfeit goods, fictitious transactions, commercial bribery and other illegal activity. The *Wall Street Journal* published an article the following morning by a reporter who had reviewed the SAIC White Paper. The article, titled "China Raps Alibaba for Fakes," read, in relevant part:

> BEIJING—The Chinese government accused e-commerce giant Alibaba of failing to crack down on the sale of fake goods, bribery and other illegal activity on its sites in a rare public dispute with one of the country's most prominent companies.
>
> The claims—which prompted Alibaba Group Holding Ltd. Wednesday to accuse a senior official at a government agency of misconduct and threaten to file a formal complaint—highlight a major risk for the company that last year raised $25 billion from global investors in the world's largest initial public offering.
>
> Alibaba has long grappled with allegations that Taobao, its biggest e-commerce platform, is rife with counterfeit goods. The accusations from the Chinese government could lend further force to those complaints and damage Alibaba's reputation among investors and brands overseas, while the highly public spat could hurt the company's relationship with the government, experts warn.
>
> The government's accusations are in a white paper made public on Wednesday by China's State Administration for Industry and Commerce, but based on conversations between the agency and Alibaba officials in July. That was two months before Alibaba's U.S. IPO, which valued the Chinese

**company at more than $230 billion.** In the paper, the agency said it held off on disclosing details of the talk so as not to affect the IPO.

**The paper alleged that Alibaba turned a blind eye to the sale of fake cigarettes, alcohol and branded handbags by vendors on its marketplace sites, as well as the sale of restricted weapons and other forbidden items.**

**It alleged that Alibaba staffers took bribes from merchants and others seeking help to boost their search rankings and to get advertising space. It also alleged that Alibaba ignored the practice by some vendors of faking transactions to make their sales volumes appear higher.**

The paper also said **company officials did nothing to stop merchants from using tactics such as false and misleading advertising.** It accused Alibaba of alleged anticompetitive behavior such as forbidding merchants to participate in rival sites' promotions.

The report said **the problems had grown to become Alibaba's "greatest credibility crisis" since the company was established.** Citing a Chinese phrase that refers to letting a small problem fester, the paper said, **"for a long time, [Alibaba] didn't pay sufficient attention to the issue and didn't adopt effective measures, causing a neglected carbuncle to become the bane of its life."**

The *Wall Street Journal* article quoted commentators who emphasized the seriousness of the disclosures and its significance to investors:

> **"There's no question that [the government has] concluded Alibaba isn't doing enough,"** said Joe Simone, a Hong Kong-based anticounterfeiting lawyer specializing in China, **who called the government's open criticism "sort of unprecedented."**
> ***

> Peter Luo, a portfolio manager at U.S. asset-management firm RS Investments, which bought Alibaba shares in the IPO last year, said the accusations were concerning. **"I think this dispute could pose a serious risk for Alibaba,"** he said. **"It could damage not only Alibaba's relationship with the government and regulators, but also the perception among consumers. If consumers lose confidence in Alibaba, its business will be affected."**

> **In its prospectus filed with U.S. regulators ahead of the IPO, Alibaba said it could face legal action or reputational damage from the sale of counterfeit goods on its platforms, even as it said it had taken steps to weed out those products. It doesn't mention the July discussions with the SAIC.**

> In terms of the timing of the talks two months before the IPO, Mr. Luo said, **"As an investor, we prefer more disclosure and transparency, especially when it**

comes to important issues like regulation and relationships with the government. And in this case, the issue seems very relevant to Alibaba's core business."

44.     On this news, Alibaba ADSs declined $4.49 per ADS or approximately 4%, to close at $98.45 per ADS on January 28, 2015, with unusually high volume of approximately 42 million ADSs traded.

45.     On January 29, 2015, before the market opened, the news website Quartz (qz.com) published an English translation of the key portions of the White Paper (the Chinese original of which had already been removed from the SAIC website for unclear reasons) that outlined all of Alibaba's improper practices and faulty procedures.  The translation[1] of the SAIC White Paper first makes clear that top Alibaba executives and management were present at the meeting:

> On July 16, 2014, the administrative guidance group of the Internet Supervision Department, together with the Industry and Commerce Bureau of Zhejiang Province and Hangzhou City, held an administrative guidance forum at the Zhejiang Province Industry and Commerce Bureau. **Principal officers and management teams of the core departments of Alibaba Group attended the meeting and accepted administrative guidance.** In order not to affect the progress of the work on Alibaba's listing, the forum was carried out behind closed doors.
> ***

The SAIC White Paper then revealed the overall breadth of problems on Alibaba's platforms:

**1.     Basic status**

The administrative guidance meeting was presided by the Internet regulation director, Liu Hongliang. He pointed out that the objectives of the administrative guidance work was to comb, discuss and analyze the problems on Ali's online trading platform; to emphasize the strengthening of strict law controls, the strengthening of the implementation of territorial regulatory responsibility; to effectively curb illegal behaviors; to safeguard the legitimate rights and interests of operators and consumers; and to promote the healthy development of the online economy.

At the meeting, Director Liu Hongliang introduced briefly and analyzed the

---

[1] Quartz's translation of the White Paper contained some apparent grammatical errors, unclear wordings or phrasings, and confusing statements, although the bulk of its meaning is clear. Plaintiffs are relying on the translation provided.

situation of online trade, and pointed out that the reform of the commercial registration system has achieved good results, as the policy of [?] has being effectively promoted and fulfilled. **However, regarding to the illegal business on Ali's online trading platform, the Alibaba Group has long lacked sufficient attention to the problem and has long failed to take effective measures to control it,** which has led a canker to suffer. **This not only let Alibaba itself facing the biggest credit crisis ever since it was founded, but also casted advert effects to other online operators who carry out their businesses in accordance with the laws.** This has recently received focused criticism by public opinions, and brought huge regulatory pressures to the market regulators.

Based on an "online transaction management approach" and other relevant laws and regulations, the staff of the internet regulation department made a detailed analysis and summary of the long-term illegal transaction problems of the entry, sales, management and other aspects on Alibaba's online trade platform -- Taobao Net and T-mall, and **pointed out 19 problems in 5 aspects, with local commerce and industry bureaus' supplement of problems in another 6 aspects.**

The SAIC White Paper revealed specific problems that the SAIC's "internet regulation department" found with Alibaba's internal controls concerning the ability of businesses operating improperly to sell through its platforms:

**1. Main entry control is lax.** *First*, the **operators on the platform made unauthorized use of other business names to conduct business activities.** A large number of online shops—that are unlicensed but should get industry and commerce registration before they using the brand names in accordance with laws and regulations—are seen on Alibaba and Taobao Net. Online shops of food, cosmetics, health products, culture, business and other internet information services which must legally obtain administrative license before engaging in business, violate the relevant provisions of the main market access in network operations.

*Second*, **operators on the platform did not comply with the regulations to reveal their identities as operators.** A large number of operating subjects who did not apply for registration or did not mark their identities, violated relevant regulations in the "Internet transaction management approach."

*Third*, **the qualification examination registration for the operators on the platform is a formality.** Part of the uploaded operating licenses from verified online shops did not register the operating subjects' names, operating addresses and living addresses. Some even uploaded other's operating licenses.

*Fourth*, **the management of users' ID is not strict. Taobao Net's supervision of the IDs and shop names of the operators on its platform is not strict, which led to the invasion of other's  registered trademarks, the exclusive right of corporate names, and business interests of some well-known products and**

specific and other legitimate rights.

*Fifth*, **the auction channel is suspected of violating the order of auction market.**
The auction channel of Taobao Net provided a third party information service
platform for auction buyers and sellers, collected and froze bid deposit the auction
commission, and offered automatic bidding by a computer system, which actually
plays the functions of the auctioneers in an auction. This move has caused advert
influence to the order of the auction market.

Next, the SAIC White Paper summarizes findings about counterfeit goods and other illegal or

improper products sold through Alibaba's platforms:

**2. Poor supervision on products information.**   On the platform of Taobao Net
and Alibaba, products and service information shows **there is an invasion of
others exclusive rights to use registered trademarks, trade of substandard
quality products, and trade of products without lawful import sources, are
banned by the state, or are pyramid schemes.**

**Fake cigarettes, fake alcohol, imitation mobile phones, fake designer bags, fake
licenses, feudal superstition and gambling supplies, items that endangering
public safety, knives, eavesdropping equipment, abound.**

**The platform's entry supervision, daily monitoring, and removal of illegal
behavior in the product information area on the platform are insufficient. A
high threshold but low efficiency are seen when solving consumers' demands
about lost money and regulatory enforcement investigations. The platform is
suspected of providing convenience and conditions for behavior like
conducting business without a license, trademark infringement, false
advertising, pyramid schemes, and consumer infringement on the condition of
knowing that, should know, or being intentional or negligent.**

Next, the SAIC White Paper describes problems in Alibaba's management of sales activity,

including, *inter alia*, false advertising, commercial bribery of Alibaba employees by sellers in

order to gain selling advantages, and prevalence of fictitious transactions used to inflate the

apparent legitimacy or rating of particular sellers, as well as inadequate punishment of sellers

engaging in improper behavior:

**3. Lack of order in sales activity management.**   *First*, promotions that violate
regulations. During the promotion periods of Double 11, Double 12, national
holidays, and heated social incidents, **the platform and the operators on the
platform have behavior that misleads consumers. Some operators have illegal
promotion behavior like "raise the price first and then offer discounts," "first**

use high discounts to attract consumers and then refuse to sell, providing the reason of no stock," "Not truthfully providing comprehensive introductions to promotional activities to induce consumers to do mindless consumption," "unilaterally change or cancel promotion program in case of none force majeure."

*Second*, **False propaganda and illegal advertising.** A large number of operators on the platform use absolute languages like "the cheapest price on the internet," "the lowest price in history," "No.1 in sales," and "ranked first" to promote products. Many shops on T-mall and Alibaba used hype, fiction in their brand and enterprise introduction, and especially some fake foreign brands use fictional foreign history to make false and misleading claims. Without approval, many shop[s] within the platform, made unauthorized use of third-party trading platform which shall be issued approval to release advertising of goods (services).

*Third*, there are premium sales in which the highest prizes worth are more than the legal limit of raffle. During the promotion periods of Double 11, Double 12, national holidays, and heated social incidents, in the Raffle Premium Sales activities of the platform itself and the operators within it, highest prizes worth more than the 5000 yuan limit according to the "Anti-Unfair Competition Law." House prizes, luxury car prizes are commonly seen.

*Fourth*, [Alibaba is] forcing unreasonable additional conditions contrary to the wishes of the users when providing third-party trading platform. During the major promotions like in Double 11, and Double 12, T-mall, using the fact that its third-party trading platform market share is relatively large and dominant, mandated platform operators (suppliers) who participated in promotional activities within the platform could NOT participate in promotional activities of ANY other platforms.

*Fifth*, **Using unfair standard terms to violate consumer rights. In Taobao net and T-mall's webpage of "Legal Notice," "Taobao service agreement," and "Taobao rules"; and in Alibaba platform's webpage of "Copyright and Trademark Statement," "Legal Notice," "Terms of Service," and "Privacy Statement," there are contract forms to exclude or limit the rights of consumers, reduce or waive the responsibility of the operator, increased consumer responsibility unfair to consumers, and unreasonable rules.**

*Sixth*, **Commercial bribery.** Recent years have seen the focused outbreak of **Alibaba's staff's use of commercial bribery, which give suppliers, platform and other platforms user participants advantages of trading opportunities to exclude competitors in the "Tmall flagship store", "together cost-effective ", "through train" , "Taobao search ranking," " Home billboards", "booth during major promotional activities " and other transaction processes.**

*Seventh*, **interference with credit rating to cause unfair competition.** Some operators themselves or with others, conduct fictitious transactions and delete unfavorable evaluations on themselves or others to enhance their business

reputation, or to damage malicious competitors business reputation, which has disrupted the normal order of competition.

*Eighth*, **inadequate disposal of commercial fraud. Alibaba platform has been a longstanding part of the "China Suppliers'" alleged contract fraud and even economic fraud.** There are also some shop on Taobao Net that conduct consumer fraud. **The platform lacks monitoring for similar platforms and lacks disposal. The platform is not fully carrying out its business obligations after operators' rights are damaged.**

*Ninth*, **unreasonable internal management rules.** In "Taobao rules", **the punishment to those operators within the platform who violate the laws and regulations is too light.** This largely make illegal or potentially illegal business operators have the erroneous psychological and behavioral guide that illegal network operating costs are not high, fueling the illegal network operators to seek illegal interests improper psychological expectations and actual behavior.

Finally, the SAIC White Paper describes a weak feedback system whereby consumer complaints are not adequately dealt with, and further, inadequate controls of staff, allowing them to tip off sellers before they were investigated (presumably in exchange for commercial bribes or other benefits):

**4. Flawed feedback.**    First, it is difficult to verify the authenticity of the users' evaluation. Taobao's credit evaluation system is difficult to distinguish true and false trading, which left a room for hyping credit. Second, the cumulative value of the credit scores are too simple. Evaluation is divided into positive, neutral, negative feedback, which does not include the handling of consumer complaints, the administrative punishment cases of relevant departments. Third, unreasonable setting of rating permissions. Taobao's existing credit evaluation system is generally a one-time assessment that consumers have only one opportunity of evaluation after buying goods. The design flaw makes consumers difficult to maintain their own interests when the products are still in warranty period.

**5. Lax internal controls of staff.** In recent years, in SAIC's mission to investigate precursor chemicals, fake Donkey-hide gelatin, and do spot-checks on some online products, when SAIC provided information of illegal online shops to Taobao Net, we found most of the information of those shops were deleted. **The staff of Taobao Net was suspected of revealing the information beforehand to those shops**, which led a passive position in SAIC's job.

46.    As a Stifel Research analyst explained on January 29, 2015, "Alibaba does outline anti-counterfeit measures in its filings, but the SAIC report puts the effectiveness of these measures

into question." Stifel Research downgraded the stock to "Hold" based on the SAIC White Paper.

47.     Under Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's interpretations thereof, Alibaba was required to disclose events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  Alibaba was thus required to disclose the fact of the July 2014 SAIC meeting and the substance of the discussions therein regarding counterfeit goods, fraudulent transactions, bribery, and Alibaba's failures to curb these practices.

48.     On January 29, 2015, before the market opened, Alibaba issued a press release announcing its results for the quarter ended December 31, 2014.  The results fell below analyst expectations, with revenues of $4.22 billion for the quarter compared to a Zack's consensus estimate of $4.45 billion, and profits of $964 million, or $0.37 per share – a decline of 28% in net income over the same quarter of the prior year.  The single largest component of the quarter-over-quarter net income decline was a $241 million increase in share-based compensation expense.

49.     Due to a combination of the SAIC White Paper and the Company's results falling below analyst expectations, Alibaba's ADSs fell an additional $8.64 per share, or nearly 9%, to close at $89.81 per ADS, on volume of over 76 million ADSs trading.  The two declines collectively reduced the price of Alibaba ADSs more than 25% from its Class Period high, wiping out more than $11 billion in market capitalization.

50.     Even after the truth emerged, Defendants continued to issue false and misleading statements.  Indeed, in a January 29, 2015 press release, Defendant Tsai stated that the White Paper contained "inaccurate and unfair attacks" and reiterated the Company's purported "zero tolerance policy towards counterfeits on our platform" because "the health and integrity of our marketplaces depend on consumer trust."  After restating the Company's purported anti-counterfeit policies and

policing measures, Defendant Tsai represented:

> **When you step back and look at our overall efforts to combat illicit activities, our track record is clear.** We are certainly not perfect, and we have a lot of hard work ahead of us. In the global e-commerce marketplace there will always be people who seek to conduct illicit activities, and like all global companies in our industry, we must continue to do everything we can to stop these activities. **We take these issues seriously because we are an organization built on the value of integrity. We also take these issues seriously because we are also victims of counterfeiting. Our entire success as a company is built on the idea that customers can come to our platforms and have trust in the quality of the products they purchase.** And customers clearly continue to give us their votes of confidence, especially when you consider the 334 million annual active buyers and 45% year-on-year growth in active buyers we reported today.

51.     Further, on February 4, 2015, the website www.techinasia.com reported on a speech Defendant Ma had just given in Hong Kong:

> **In the speech, Ma said that actual counterfeit products on Taobao are rare.** But because the site is a C2C marketplace where anybody can open a shop, Ma says it does feature lots of what he calls "web products": items designed and created by regular users that have never gotten any sort of official approval. **Said Ma: "Actually, Taobao doesn't have many fake products. There are some products that are original creations, without official approval, but that doesn't mean they're fakes. These are classified as 'web products.'"**

> When it was pointed out that fake degrees from the very university he was speaking at were available for sale on Taobao at the time of his speech, Ma responded: "It's very hard for us to be perfect, so what's important is that we keep improving; I trust that a colleague has already dealt with that problem."

> Ma says that Alibaba has more than 2,000 workers whose full-time job is checking Taobao for fakes. But with more than a billion products on the site, it's still difficult to catch fake items unless they're reported by users.

> **As of this writing it is absurdly easy to find counterfeit products on Taobao.** A quick search for "Liverpool," for example, turns up tons of jerseys and other products related to the Premier League football club Liverpool F.C., none of which are officially licensed. In keeping with the Liverpool theme, a search for "The Beatles" also turns up a variety of counterfeit items. **These are not, as Jack Ma might suggest, intellectually original creations that simply lack the proper government licenses. They are straight-up fakes.**

## VII.  SCIENTER ALLEGATIONS

52.     As alleged herein, Defendants acted with scienter in that they: knew that the public

documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Alibaba, their control over, and/or receipt and/or modification of Alibaba's allegedly materially misleading misstatements, participated in the fraudulent scheme alleged herein.

53.     Defendants were undoubtedly aware of the July 2014 SAIC meeting, and of the substance of the discussions at that meeting, because, as the SAIC White Paper disclosed, "[p]rincipal officers and management teams of the core departments of Alibaba Group attended the meeting and accepted administrative guidance."

54.     Defendants had actual knowledge that: (1) the July 2014 SAIC meeting had taken place; (2) that the SAIC had given Alibaba an extremely negative assessment of its attempts to curb counterfeit and contraband sales; (3) the SAIC had notified Alibaba of widespread allowance of fraudulent transactions on its platforms, and of commercial bribery of its employees; (4) the Company's public statements, in SEC filings and elsewhere, about its internal controls and policies to curb sales of counterfeit goods were grossly inadequate and ineffective; and (5) Alibaba's outsized revenue and earnings growth were in large part due to sales of counterfeit goods.

## VIII.   LOSS CAUSATION

55.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Alibaba ADSs and operated as a fraud or deceit on Class Period purchasers of Alibaba ADSs by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations

27

and fraudulent conduct were disclosed, or materialized, and became apparent to the market, the price of Alibaba ADSs fell precipitously. As a result of their purchases of Alibaba ADSs during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

56.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Alibaba's business and prospects, financial position, and results of operations. Defendants' false and misleading statements caused Alibaba's securities to trade at artificially inflated levels throughout the Class Period.

57.     The decline in value of the common was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline of Alibaba ADSs negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme and caused the subsequent significant decline in the value of Alibaba ADSs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX.   NO SAFE HARBOR

58.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements set forth in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying relevant

important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Cautionary language must truthfully address specific risks, must exhaust the capacity of the false statements to mislead investors, and must disclose, as Defendants failed to do here, then existing adverse facts. Alternatively, to the extent that the statutory safe harbor is intended to or does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Alibaba who knew that those statements were false when made. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

59.     The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or omissions of existing material facts.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET

60.     Plaintiff is entitled to a presumption of reliance because the claims asserted herein against Defendants are predicated in part upon false statements of material fact and/or the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, that Defendants had a duty to disclose.

61.     At all relevant times, the market for Alibaba ADSs was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.

62.     The market for Alibaba ADSs was efficient because, inter alia, throughout the Class

Period:

    a.   Alibaba ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    b.   During the Class Period, there were approximately 2.23 billion Alibaba ADSs traded on the open market; with trading in excess of 15 million ADSs a day on the vast majority of days during the Class Period;

    c.   As a regulated issuer, Alibaba filed periodic public reports with the SEC and the NYSE;

    d.   Alibaba regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as quarterly conference calls with securities analysts, investors, communications with the financial press and other similar reporting services, as well as presentations and various industry and market symposia and conferences; and

    e.   Securities analysts followed and published research reports regarding Alibaba that were publicly available to investors, including at least 38 securities analysts employed by major firms, among others: Matthew Nemer of Wells Fargo Securities; Ella Ji of Oppenheimer & co.; Dick Wei of Credit Suisse; Erica Poon Werkun of UBS; Alex Yao of JPMorgan; Vey-Sern Ling of BNP Paribas Equity Research; Alicia Yap of Barclays; Piyush Mubayi of Goldman Sachs; Cynthia Jihong Men of

Jefferies; and Alice Yang of Macquarie. Each of these analysts wrote reports about Alibaba that were distributed to the sales force and available to customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

63.     Throughout the Class Period, Alibaba was consistently followed by the market, including securities analysts as well as the business press. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Alibaba and the Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's securities.

64.     As a result of the misconduct alleged herein (including defendants' misstatements and omissions of material facts), the market for Alibaba's securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions of material facts for which defendants are each responsible.

65.     Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Alibaba ADSs at artificially inflated prices and the subsequent decline in the price of the securities when the truth was disclosed.

66.     The market for Alibaba ADSs promptly digested current information regarding Alibaba from all publicly available sources and reflected such information in Alibaba's securities price. Under these circumstances, all purchasers of Alibaba's ADSs during the Class Period

suffered similar injury through their purchase of ADSs at artificially inflated prices and a presumption of reliance applies.

## XI.    CAUSES OF ACTION

### COUNT I
### (Against All Defendants)
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

67.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

68.     Throughout the Class Period, Defendants, directly or indirectly, engaged in a common plan, scheme and continuing course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Alibaba ADSs.

69.     The purpose and effect of Defendants' plan, scheme and course of conduct were to artificially inflate the price of Alibaba's ADSs and to artificially maintain the market price of Alibaba ADSs.

70.     Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with severely reckless disregard for the truth when it failed to ascertain and disclose the true facts in the statements made by it to members of the investing public, including Plaintiff and the Class, and the securities analysts.

71.     As a result of the foregoing, the market price of Alibaba ADSs was artificially

inflated during the Class Period.  In ignorance of the falsity of Defendants' statements concerning Alibaba's financial well-being and prospects, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of Alibaba ADSs during the Class Period in purchasing Alibaba ADSs at prices which were artificially inflated as a result of Defendants' false and misleading statements.

72.     Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased Alibaba ADSs in ignorance of the financial risk to them as a result of such nondisclosures.

73.     As a result of the wrongful conduct alleged herein, when the truth concerning Defendants' false statements and omissions was revealed to the investing public and the artificial inflation in the price of Alibaba ADSs was, as a result, reduced and ultimately removed, in a series of corrective disclosures and/or the materialization of the concealed risks, Alibaba's share price fell significantly and Plaintiff and other members of the Class suffered damages in an amount to be established at trial.

74.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the Plaintiff and the other members of the Class for substantial damages that they suffered in connection with their purchase of Alibaba ADSs during the Class Period.

## COUNT II
### (Against the Individual Defendants)
### Liability Pursuant to Section 20(a) of the Exchange Act

75.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

76.     Each of the Individual Defendants, by virtue of their positions with Alibaba and their specific acts, was a controlling person of Alibaba within the meaning of Section 20(a) of the

Exchange Act.

77.     They had the power and influence and exercised same to cause Alibaba to engage in the illegal conduct and practices complained of herein.  The Individual Defendants were thereby and otherwise active and culpable participants in the fraud perpetrated by Alibaba.

78.     By reason of the conduct of Alibaba as alleged in this Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct of Alibaba and liable to Plaintiff and the Class for the substantial damages which they suffered in connection with their purchases or acquisitions of ADSs as a result of Alibaba's violations of the Exchange Act.

79.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Certifying Plaintiff as the Class Representative and her counsel as Class Counsel;

C.      Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.      Awarding monetary damages against Defendants in favor of Plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.      Awarding Plaintiff and the Class its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F.      Granting such other and further relief as deemed appropriate by the Court.

## XIII.   <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: February 11, 2015                    Respectfully submitted,

WOLF POPPER LLP

By: _Robt C. Finkel_
Robert C. Finkel
Fei-Lu Qian
Joshua H. Saltzman
845 Third Avenue
New York, NY 10022
Telephone:  (212) 759-4600
Facsimile:  (212) 486-2093
rfinkel@wolfpopper.com
fqian@wolfpopper.com
jsaltzman@wolfpopper.com

*Counsel for Plaintiff*

## PLAINTIFF CERTIFICATION
## UNDER THE FEDERAL SECURITIES LAWS

I, Claire Rand, hereby state:

1.      I have reviewed the attached complaint against Alibaba Group Holding Ltd. ("Alibaba") and certain of its executives and have authorized the filing of the complaint on my behalf.

2.      I am willing to serve as a representative party on behalf of the Class, as defined in the above referenced complaint, including providing testimony at deposition and trial, if necessary.

3.      The following includes all of my transactions in American Depositary Shares of Alibaba during the Class Period set forth in the Complaint are as follows:

| Date | Type | Quantity | Price Per Share |
|------|------|----------|-----------------|
| 11/12/2014 | Purchase | 100 | $118.29 |

4.      I did not purchase these securities at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

5.      During the three-year period preceding the date of signing this certification, I have not sought to serve, and have not served, as a representative on behalf of a class in any private action arising under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, including lost wages relating to the representation of the Class.

7.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of February, 2015

By: _____
        Claire Rand